UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DARYISE L. EARL,

      Plaintiff,

v.                                                                 Case No. 15-C-282

BRIAN FOSTER, *et al.*,

      Defendants.

**DECISION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Daryise L. Earl, a Wisconsin state prisoner who is representing himself, filed a civil rights action under 42 U.S.C. § 1983, alleging that defendants violated his First and Eighth Amendment rights at the Green Bay Correctional Institution ("GBCI"). (ECF No. 15). On August 4, 2015, Judge Rudolph T. Randa, who was assigned to the case at the time, screened the complaint and allowed plaintiff to proceed on the following claims: (1) First Amendment retaliation against defendants Dave Brooks, Stephanie Faltyski, and John/Jane Does; (2) Eighth Amendment deliberate indifference against defendants Michael Helmeid, Richard Karl, and John/Jane Does; and (3) failure to intervene against defendant Brian Foster. (ECF No. 22). Through discovery, plaintiff identified Mary Alsteen as one of the Jane Does in the Eighth Amendment claim and he added her as a defendant on June 3, 2016. (ECF No. 83).

This matter is before me on defendants' motion for summary judgment. (ECF No. 109). For the reasons below, I will grant defendants' motion and will dismiss the case.

# FACTS[1]

At the time relevant to this matter, plaintiff was an inmate at GBCI. (ECF No. 111, ¶ 1). Defendants were Department of Corrections employees who worked at GBCI: Brian Foster was Warden (*id.*, ¶ 4); Dave Brooks was Food Service Manager (*id.*, ¶ 3); Michael Helmeid was Lieutenant (*id.*, ¶ 5); Stephanie Faltyski was Lieutenant (*id.*, ¶ 2); Richard Karl was Kitchen Supervisor (*id.*, ¶ 6); and Mary Alsteen was a nurse (*id.*, ¶ 124). The material facts are not in dispute.

Plaintiff served as a "bowl cook" at GBCI between October 13, 2013 and October 16, 2014.[2] (*Id.*, ¶ 50). On September 25, 2014, plaintiff injured his knee when he slipped and fell while working in the main kitchen. (ECF No. 124, ¶ 1). He went to the Health Services Unit ("HSU") and a nurse examined his knee. (ECF No. 111, ¶ 12). The nurse issued a Special Needs/Medical Restriction form ("medical restriction") and allowed plaintiff to have medical ice four times a day, an extra pillow, and "no work" between September 25, 2014 and September 29, 2014.[3] (*Id.*, ¶ 13). The nurse also prescribed ibuprofen and crutches, which plaintiff declined. (*Id.*, ¶ 12).

---

[1] The facts in this section are taken from defendants' Proposed Findings of Fact (ECF No. 111), plaintiff's declaration and attached exhibits (ECF No. 121-1), defendants' response to plaintiff's "Disputed Facts" (ECF No. 124), and plaintiff's Amended Complaint (ECF No. 15), which I construe as an affidavit at the summary judgment stage. *See Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996).

[2] A "bowl cook" is responsible for preparing, cooking, and serving a total of 3,500 meals in a day. (ECF No. 111, ¶¶ 51, 66). Bowl cook is a higher level job than an entry level kitchen job, and it requires more skill and knowledge that an entry level job. (*Id.*, ¶ 71).

[3] According to plaintiff, medical ice is "bagged ice of at least 24 ounces" and regular ice is "a 6 ounce scoop without the bag." (ECF No. 119 at 8).

2

Two days later, on September 27, 2014, plaintiff told Lieutenant Michael Helmeid that prison staff failed to give him medical ice four times a day (he only received regular ice twice a day) and he did not receive an extra pillow. (ECF No. 15, ¶ 10). Helmeid does not specifically recall plaintiff voicing a complaint about the failure to receive prescribed medical treatment but both parties agree that Helmeid listened to his problem, engaged him in conversation, and plaintiff believed that Helmeid would solve the problem after he left. (Helmeid Dec., ECF No. 71, ¶¶ 12-13; *see also* Earl Depo., ECF No. 113 at 44:8-46:6).

Two days later, on September 29, 2014, plaintiff's medical restriction ended and plaintiff went to HSU for a follow-up appointment. (ECF No. 111, ¶ 16). A nurse noted that plaintiff's knee was improving but was still swollen, and she ordered a medical restriction for "no work," "meals on unit," and an ace wrap from September 29, 2014 to October 2, 2014. (*Id.*) Plaintiff also told the nurse that he didn't like taking pills and was not taking ibuprofen. (ECF No. 124, ¶ 3).

Plaintiff's second medical restriction ended on October 2, 2014, and plaintiff went to HSU for another follow-up appointment with nurse Katie Brueker. (ECF No. 124, ¶ 4). Brueker diagnosed plaintiff's knee injury as a "sprain" and she stressed the need for plaintiff to take medication to reduce swelling; she prescribed Naproxen. ( ECF No. 111, ¶ 17). Brueker also referred plaintiff to physical therapy and extended plaintiff's medical restriction for "no work" until October 13, 2014. (*Id.*)

On October 7, 2014, plaintiff wrote to the Inmate Complaint Examiner ("ICE") regarding the condition of inmate work boots (they lacked traction), which according to plaintiff, had caused him to slip and fall on September 25, 2014. (ECF No. 15, ¶ 13). ICE Alan DeGroot wrote back the

3

next day stating that plaintiff would have to discuss the problem with Captain Gavin before he could accept plaintiff's inmate complaint. (*Id.*)

On October 8, 2014, plaintiff filed offender complaint GBCI-2014-19771 alleging that prison staff only gave him ice twice a day and did not give him an extra pillow. (ECF No. 111, ¶ 97). ICE Jodene Perttu contacted North Cell Hall and spoke to an individual who stated that a memo had recently gone out instructing staff that ice could only be delivered twice a day, per prison policy. (*Id.*, ¶ 98). This individual also stated that there was a shortage of pillows in the unit. (*Id.*, ¶¶ 46-48, 98). Each bed required one pillow, and there were only enough pillows for one pillow per bed. (*Id.*) Thus, it was possible that plaintiff had not received an additional pillow. (*Id.*, ¶ 98).

Based on the conversation above, Perttu concluded that there was a misunderstanding on the prison policy regarding ice. (ECF No. 69-2). Perttu wrote "if there was a need for ice more than twice/day, a medical restriction is written, and the inmate should receive ice as scheduled twice a day and two more times in addition to that." (*Id.*) Perttu recommended affirming plaintiff's complaint with instructions to prison staff to fix the problem; Warden Brian Foster affirmed the recommendation. (ECF No. 111, ¶ 100).

On October 9, 2014, plaintiff wrote to Foster explaining that nurses were not qualified to diagnose his injury as a "sprain." (ECF No. 124, ¶ 20.) The next day, on October 10, 2014, plaintiff saw a physical therapist. (ECF No. 15, ¶ 15). According to plaintiff, the therapist believed that plaintiff may have torn a ligament in his knee. (*Id.*) The therapist ordered an MRI, which was approved on October 14, 2014. (ECF No. 111, ¶ 19).

On October 13, 2014, the plaintiff's third medical restriction ended, and plaintiff received a kitchen schedule with instructions to report to work the following day. (ECF No. 124, ¶ 5).

Plaintiff spoke with Correctional Officer Ritchie and told him that he was still in pain and could not work the following day. (*Id*. ¶ 7; ECF No. 111, ¶ 124). Ritchie called HSU and spoke with Nurse Mary Alsteen, who confirmed that there were no pending work restrictions on plaintiff. (ECF No. 111, ¶ 124). Ritchie told plaintiff to report to work the next day and to put in a "blue slip" if he wanted medical attention. (ECF No. 15, ¶ 17). Plaintiff wrote to Foster that same day stating HSU had allowed his "no work" restriction to expire, which would force him to work the next day with an injured knee. (ECF No. 124, ¶ 21). Plaintiff sent a similar letter to HSU that same day. (ECF No. 111, ¶ 20). Foster and HSU responded to plaintiff's letters in the following weeks.[4]

The following day, October 14, 2014, plaintiff reported to work. (ECF No. 124, ¶¶ 13-15). According to Food Services Manager Dave Brooks, plaintiff appeared fit to work. (ECF No. 111, ¶ 59). Plaintiff concedes that he was walking without crutches or the assistance of other inmates. (*Id*., ¶ 122). Plaintiff spoke with Kitchen Supervisor Richard Karl and showed Karl his "enlarged and deformed knee." (ECF No. 124, ¶ 13). Karl called HSU and confirmed that there were no pending work restrictions on plaintiff. (ECF No. 111, ¶¶ 54-55). Karl then ordered plaintiff to work and threatened to issue a conduct report if he did not. (ECF No. 15, ¶ 20; ECF No. 124, ¶¶ 7-8, 13). Inmates Kraig Carter and Demetrius McGee offered to cover plaintiff's shift, but Karl said "no" because plaintiff was "faking." (ECF No. 121-1 at 11 and 33). After an "extremely hostile confrontation," Karl allowed plaintiff to take "sick-cell" after completing the three-hour breakfast shift. (ECF No. 15, ¶ 21).

---

[4] Foster responded to plaintiff's two letters on October 30, 2014 after confirming that plaintiff had been seen by medical staff on 9/25/14, 9/29/14, 10/2/14, and 10/14/14. (ECF No. 111, ¶ 96). HSU responded to plaintiff's letter on October 15, 2014 stating that his work restriction had been extended, he was scheduled for physical therapy, and was scheduled for a follow-up appointment with a nurse practitioner. *Id*., ¶ 23.

Later that day, on October 14, 2014, plaintiff received a medical pass to see the physical therapist. (*Id.*, ¶ 22). The therapist "reiterated the previous conclusion" that plaintiff had torn a ligament in his knee, and he spoke with a doctor who ordered a "no work" medical restriction for six weeks, until November 25, 2014. (ECF No. 15, ¶¶ 22-23; ECF No. 111, ¶ 33).[5]

After plaintiff received the six-week "no work" medical restriction, Brooks recommended removing plaintiff from his job as a bowl cook so that the kitchen could fill the position to meet its institutional and operational needs. (ECF No. 111, ¶ 73). Plaintiff had already been out of work for three weeks, and other bowl cooks who had been covering his position were not getting their scheduled days off. (*Id.*, ¶ 74). Lieutenant Stephanie Faltyski, the Institution Reviewing Representative for all work/program placement requests, approved the recommendation on October 15, 2014. (*Id.*, ¶¶ 72, 77).

On October 22, 2014, plaintiff received a work removal form which stated "due to operational needs, we will be removing inmate Earl from the kitchen payroll. He would be eligible to work in the kitchen once he is able to come back." (ECF No. 15, ¶ 27). That same day, plaintiff wrote to Foster and Faltyski about getting fired from his kitchen job "in retaliation" for complaining about work conditions and his knee injury. (ECF No. 124, ¶ 28). Faltyski responded by explaining that plaintiff was not fired, but his position in the kitchen needed to be filled and he could return

---

[5] The MRI was not performed, however, until January 15, 2015. The MRI showed that plaintiff had a small undersurface horizontal tear near the free edge of the posterior horn of the medial meniscus. (ECF No. 121-1 at 34). Plaintiff also had tendinosis at the medial aspect of the quadricep, cartilage loss and osteophytosis along the weight-bearing surface of the medial femoral condyle, and a "7mm loose body" just medial to the tibial attachment of the posterior cruciate ligament. (*Id.*) In November 2015 Dr. Chad T. Zehms performed arthroscopic surgery to address these conditions at St. Mary's Hospital in Green Bay. Plaintiff's deliberate indifference claims relate to the period shortly after he injured his knee and prior to the MRI and surgery. (*Id.* at 37-38.)

once he was able to work. (ECF No. 15, ¶ 28.) Plaintiff wrote again to Foster and Faltyski on October 26, 2014. (ECF No. 124, ¶ 22).

On or around November 4, 2014, plaintiff filed offender complaint GBCI-2014-21654 alleging that he was unjustly removed from his kitchen job due to work-related injuries. (ECF No. 111, ¶ 102). ICE DeGroot recommended dismissing the complaint because plaintiff's position could not be vacant for six weeks. (ECF No. 69-3). Foster agreed with DeGroot's recommendation and dismissed the complaint on November 6, 2014. (ECF No. 111, ¶ 104). That same day, plaintiff received an inmate pay adjustment form which indicated that he would be credited 64 hours of "regular pay" in place of the "sick pay" he had been receiving between October 5, 2014 and October 15, 2014. (ECF No. 15, ¶¶ 30-31). On November 25, 2014, plaintiff's "no work" restriction expired and he was eligible to reapply for his job in the kitchen. (ECF No. 111, ¶ 33).

The record is unclear as to what, if anything, happened with plaintiff's employment between November 25, 2014 and February 12, 2015. On February 12, 2015, Faltyski received a DOC-1408 form from the Dorm-A Kitchen Supervisor requesting to assign plaintiff to work in the Dorm-A kitchen.[6] (ECF No. 111, ¶ 85). Faltyski approved the request. (*Id*.) On February 19, 2015, plaintiff contacted Faltyski stating that there was a mistake and plaintiff had actually wanted to work in the main kitchen, not the Dorm-A kitchen. (*Id*., ¶ 87). Faltyski responded that she spoke with Brooks and he knew nothing about plaintiff going to the main kitchen. (*Id*.) She stated that the request form she received was from the Dorm-A Kitchen Supervisor, and plaintiff would have to wait 90 days

---

[6]At GBCI, inmates must send in a work request to work in a specific area. (ECF No. 111, ¶ 86). Work supervisors do not request specific inmates to work in their department unless the inmate specifically asks. (*Id*.)

7

before he could request a new work assignment. (*Id.*) Plaintiff worked in the Dorm-A kitchen for about one year and was fired after receiving a conduct report for stealing. (*Id.*, ¶ 88)

**STANDARD OF REVIEW**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 322-23. The court takes all facts, and reasonable inferences from those facts, in the light most favorable to the non-moving party and grants summary judgment if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

**ANALYSIS**

To prevail on a civil rights claim under 42 U.S.C. § 1983, plaintiff must show that: (1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)). Liability under § 1983 is predicated on a defendant's personal involvement in the constitutional deprivation. *Gentry v. Duckworth*, 65 F.3d

555, 561 (7th Cir. 1995). Plaintiff must prove that each defendant was in some way personally responsible for the alleged deprivations and that the deprivations occurred with the knowledge and consent of that defendant. *Id*.

**<u>First Amendment Retaliation</u>**

Plaintiff alleges that Brooks and Faltyski fired him from his job in the main kitchen, and later refused to re-hire him in the main kitchen, in retaliation for an inmate grievance he filed in October 2014 regarding unsafe work conditions. Brooks, the food services manager, made the initial recommendation to remove plaintiff from his position in the main kitchen, and Faltyski, the institution reviewing representative, accepted the recommendation. Later, in February 2015, Faltyski reassigned plaintiff to work in the Dorm-A kitchen instead of the main kitchen.

To establish a prima facie case of retaliation, plaintiff must produce evidence that he: (1) engaged in constitutionally protected speech, (2) suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). If plaintiff establishes these three elements, the burden shifts to the defendants to show by a preponderance of evidence that they would have taken the same action even without any retaliatory motive. *Spiegla v. Hull,* 371 F.3d 928, 943 (7th Cir. 2004)(citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).

I will assume that plaintiff can make a prima facie case of retaliation with respect to removal from his job in the main kitchen in October 2014. Nevertheless, Brooks and Faltyski can show by a preponderance of evidence that they would have taken the same actions even without retaliatory

9

motive. All parties agree that plaintiff had a knee injury and was unable to stand for long periods of time without pain. Plaintiff's job as a morning bowl cook required him to be on his feet to prepare, cook, and serve the breakfast and noon meal, and to start preparations for the evening meal. Further, bowl cook was a job that required more skill and knowledge than an entry level kitchen job, and during plaintiff's initial three week absence, other bowl cooks had to fill plaintiff's position and were not getting their scheduled days off. Plaintiff's job could not be vacant for six more weeks given that plaintiff's absence during the prior three weeks was already affecting the kitchen's efficiency. Thus, Brooks and Faltyski more than meet their burden to show that plaintiff would have been removed from his job even if he had not filed his inmate grievance regarding work conditions.

Further, plaintiff's retaliation claim regarding his reassignment to the Dorm-A kitchen (instead of the main kitchen) in February 2015 amounts to nothing more than speculation. On February 12, 2015, Faltyski received a work request from the Dorm-A Kitchen Supervisor requesting plaintiff work as a bowl cook in the Dorm-A kitchen; she approved the request. Both parties agree that an inmate must request work in a specific area in order to receive a specific assignment, and work supervisors do not request an inmate be assigned in their area absent a specific request from that inmate. Plaintiff concedes that he spoke with a Dorm-A sergeant, on at least one occasion, about wanting to work in the kitchen, and that individual misinterpreted his request. (*See* ECF No. 15, ¶ 37)("On or about February 17, 2015[,] Earl was speaking to Dorm's A [sic] Sergeant about wanting his kitchen job back, the Sgt. interpreted Earl's request as wanting to work in the Dorm's kitchen, as opposed to the main kitchen."). It is likely that plaintiff also spoke with someone regarding his work assignment in the Dorm-A kitchen prior to February 12, 2015, as that is the day Faltyski received the request from the Dorm-A kitchen supervisor.

10

Regarding Brooks, plaintiff states that "sometime in February" he had also written to Brooks to be rehired in the main kitchen. (ECF No. 124, ¶ 19). Inmate Alan Johnson states that he gave Brooks the requests, but he too does not recall when that occurred. (ECF No. 121-1 at 17). Brooks does not recall receiving any requests from plaintiff. (Brooks Dec., ECF No. 70, ¶ 18). Faltyski states that she did speak with Brooks, at some point after February 19, 2015, about plaintiff's request to work in the main kitchen, but neither plaintiff nor Johnson recall when Johnson delivered plaintiff's requests. Thus, there is no way of knowing whether Faltyski spoke with Brooks before or after Brooks allegedly received plaintiff's work requests. Because the facts surrounding plaintiff's reassignment to the Dorm-A kitchen are unclear, any retaliation claim against Brooks or Faltyski regarding his reassignment to the Dorm-A kitchen would be pure speculation. *See Rockwell Automation, Inc., v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 544 F.3d 752, 757 (7th Cir. 2008)(concluding that "mere speculation or conjecture will not defeat a motion for summary judgment"). Thus, plaintiff's retaliation claims do not survive summary judgment.

**Eighth Amendment Deliberate Indifference**

Plaintiff alleges that Helmeid, Karl, and Alsteen showed deliberate indifference towards his severe knee pain during the three-week period prior to October 14, 2014 (the day plaintiff received his six-week "no work" restriction). Helmeid allegedly "ignored" plaintiff, on September 27, 2014, when plaintiff told him that prison staff had failed to provide him with ice four times a day and an extra pillow. Alsteen failed to thoroughly check plaintiff's medical file, on October 13, 2014, when Correctional Officer Ritchie called HSU to see if plaintiff had any pending work restrictions for the following work day. Karl "forced" plaintiff to work a three-hour breakfast shift during the morning of October 14, 2014, even after plaintiff showed Karl his "enlarged and deformed" knee and told

11

Karl he was in pain. Plaintiff's treatment and medical care after October 14, 2014 are not at issue in this case.[7]

Deliberate indifference contains both an objective element and a subjective element. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). Under the objective element, plaintiff must show that his medical condition was sufficiently serious. *Id*. at 1373. A medical condition is sufficiently serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Id.*

Under the subjective element, plaintiff must show that prison officials acted with a sufficiently culpable state of mind. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A prison official must have actual knowledge of an inmate's serious medical condition and either act or fail to act in disregard of that risk. *Roe*, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998). To that end, a prison official who takes reasonable measures to accommodate or treat a medical condition is not deliberately indifferent. *See Farmer*, 511 U.S. at 847.

No reasonable view of the evidence can lead to the conclusion that Helmeid, Karl, and Alsteen showed deliberate indifference towards plaintiff's severe knee pain. Plaintiff interacted with Helmeid once, on September 27, 2014, and plaintiff concedes that Helmeid did not ignore him on that day. (*See* ECF No. 113 at 44:8-46:6). Plaintiff states that Helmeid engaged him in conversation regarding the ice and pillow, and plaintiff believed that Helmeid would take care of the problem after he left. (*Id*.) Plaintiff acknowledges that he believes Helmied "ignored" him only

---

[7] Plaintiff's only allegation involving his actual medical care is stomach trouble due to prescription medication for pain management. ECF No. 15, ¶ 33. Plaintiff was not allowed to proceed with a claim regarding these facts. ECF No. 22 at 6-8.

12

because he ultimately did not receive what he asked for. (*Id*.) As it turned out, there was a shortage of pillows in plaintiff's unit and a memo had recently gone out instructing prison staff to only deliver ice twice a day, which is what plaintiff received. Apparently, some members of the correctional center did not realize that the general policy was not applicable to inmates who were prescribed ice for medical reasons, an issue that was only cleared up later in response to plaintiff's complaint. Confusion is not deliberate indifference. Given the circumstances in plaintiff's unit, no reasonable view of the evidence shows that Helmeid's one interaction with plaintiff approached "intentional wrongdoing." Failing to provide ice and a pillow on one occasion to an inmate with a knee injury may reflect incompetence or forgetfulness, but it does not amount to cruel and unusual punishment within the meaning of the Eighth Amendment.

Alsteen was the nurse on staff, on October 13, 2014, when Correctional Officer Ritchie called to determine whether plaintiff had a "no work" restriction for the following day. Alsteen looked at plaintiff's file and correctly told Ritchie that plaintiff did not. Plaintiff suggests that Alsteen should have more thoroughly scrutinized his file, and should have inferred from his prior "no work" restrictions that he needed an extension for October 14, 2014. However, when Alsteen spoke to Ritchie on October 13, 2014, plaintiff's file indicated that he had a "sprain." Based on this initial diagnosis, Alsteen's conclusion that plaintiff's knee pain was not an emergency that required immediate action was reasonable.

Lastly, on the morning of October 14, 2014, plaintiff showed Karl his "enlarged and deformed knee" and told Karl that he had knee pain. Karl called HSU and spoke with someone who indicated that plaintiff did not have any pending work restrictions. Karl then ordered plaintiff to

13

continue working and threatened to issue a conduct report if he did not. Karl also did not allow other inmates to cover plaintiff's shift even though those individuals had offered to do so.

Although Karl may have called plaintiff a "liar" and accused plaintiff of "faking" his injuries, he did so only after HSU had confirmed that plaintiff did not have any pending work restrictions. The fact that he checked with HSU shows concern for plaintiff's condition, not deliberate indifference. Karl's words and conduct may have been rude or disrespectful, but they were not unreasonable given his conversation with HSU. *See DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000)(concluding that verbal harassment, name calling, and rude comments by prison staff do not violate the Eighth Amendment); *see also Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987)(concluding unprofessional conduct does not violate the constitution.) Karl, who is not a medical professional, reasonably relied the judgment of medical professionals. *See Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006). Moreover, plaintiff admits that he was walking on his own without the help of others (he had previously refused crutches and was not using a wheelchair), and after three hours Karl allowed him to go on "sick cell." No reasonable view of the evidence shows deliberate indifference on the part of Helmeid, Alsteen, and Karl.

**Defendant Foster**

Plaintiff alleges that he notified Foster numerous times through inmate grievances and correspondences about issues regarding his knee injury and improper removal from his kitchen job. Plaintiff states that Foster ignored his complaints and did nothing. The evidence on the record, however, shows otherwise.

Foster served as the reviewing authority on two of plaintiff's inmate complaints: GBCI-2014-19771 and GBCI-2014-21654. (ECF No. 111, ¶¶ 100, 104). In both, Foster reviewed the record,

14

agreed with ICE's recommendation, and affirmed the decision. (ECF No. 69-2; ECF No. 69-3). Foster affirmed the complaint involving medical care and dismissed the complaint involving improper removal from his job. Foster's decision to affirm/dismiss a complaint, on its own, absent other bad acts, is insufficient for liability under § 1983. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)(concluding that a complaint examiner is not liable under 1983 for simply "carry[ing] out [his] job exactly as [he] was supposed to.").

Plaintiff's only other allegation against Foster involves two letters (October 9, 2014 and October 13, 2014) regarding that same issues as his inmate complaints. After receiving those letters, Foster spoke with someone at HSU and confirmed that plaintiff was receiving on-going medical treatment. Plaintiff had been seen by medical staff on 9/25/14, 9/29/14, 10/2/14, and 10/14/14. Foster then responded by letter on October 30, 2014. (ECF No. 69-1). Plaintiff suggests that Foster showed deliberate indifference by taking two whole weeks to respond to his correspondences. However, GBCI houses 1,040 inmates, and two weeks is a reasonable amount of time given that Foster must investigate allegations prior to responding.

Finally, a warden is liable for failure to intervene only when an inmate has actually suffered a constitutional violation, and the warden had a realistic opportunity to intervene to prevent the harm from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). For the reasons set forth above, plaintiff did not suffer a constitutional violation. Defendants' motion for summary judgement will therefore be granted and the case dismissed.

**ORDER**

**THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment (Docket # 109) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing plaintiff's claims and this action.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3-4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated this __26th__ day of May, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
U.S. District Court - WIED
